WISCONSIN DEPARTMENT OF WORKFORCE DEVELOPMENT,
Plaintiff-Appellant,

v.

WISCONSIN LABOR AND INDUSTRY REVIEW COMMISSION
and Dunham Express Corporation,
Defendants-Respondents.†

Court of Appeals

*No. 2009AP1364. Submitted on briefs February 5, 2010.
—Decided July 8, 2010.*

2010 WI App 123

(Also reported in 792 N.W.2d 182.)

† Petition for review dismissed 9-1-2010.

Before Dykman, P.J., Lundsten and Higginbotham, JJ.

¶ 1. DYKMAN, P.J. The Wisconsin Department of Workforce Development (DWD) appeals from a circuit court order affirming a decision by the Wisconsin Labor and Industry Review Commission (LIRC) that Dunham Express Corporation is not liable for unemployment insurance contributions for its "contract drivers." DWD argues that LIRC's decision is not entitled to any deference because its interpretation of the applicable statute and administrative rules was plainly erroneous and its findings of fact were not supported by substantial and credible evidence. It contends that Dunham failed to establish that the drivers were free from Dunham's direction and control in performing services for Dunham, or that the drivers were engaged in independently established businesses, as required under WIS. STAT. § 108.02(12)(c) (2007–08)[1] to avoid classification as "employees." LIRC responds that its decision is entitled to great weight and controlling deference, that all of its factual findings are supported by the record, and that it properly determined that Dunham's contract drivers were not employees under § 108.02(12)(c).[2] We reverse.

*Background*

¶ 2. The following facts are taken from the DWD hearing transcript and exhibits. Additional facts will be set forth as necessary in the discussion section. Dunham

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

[2] Dunham has filed its own response brief, raising substantially the same arguments as LIRC. For ease of reading, we refer to the arguments on appeal as LIRC's, even where those arguments are raised in Dunham's responsive brief.

Express Corporation provides package delivery services in Wisconsin. In 2000, Dunham began transitioning some of its drivers from "employee" to "contractor" status. Dunham developed a master lease agreement governing the relationship between Dunham and its "contract drivers." Currently, Dunham utilizes both "employee drivers" and "contract drivers" in its delivery services.

¶ 3. DWD audited Dunham for 2003 and 2004 and determined that Dunham was liable for $82,788 in unpaid unemployment insurance contributions plus interest for 130 of its drivers. Dunham sought review by an administrative law judge (ALJ). DWD agreed to drop its demand for payment on behalf of twelve drivers classified by Dunham as "on-demand" drivers, thus limiting its focus to 118 drivers.[3] The ALJ affirmed DWD's decision, and Dunham petitioned LIRC for review. LIRC reversed the ALJ, determining that the 118 drivers are "contractors" rather than "employees," and therefore Dunham is not liable for unemployment contributions on their behalf. DWD appealed to the Circuit Court for Dane County for review of LIRC's decision. The circuit court affirmed, and DWD appeals.

### Standard of Review

¶ 4. We accord LIRC's interpretation of statutes either great weight, due weight, or no deference. *DaimlerChrysler v. LIRC*, 2007 WI 15, ¶ 15, 299 Wis. 2d 1, 727 N.W.2d 311. We accord great weight deference where

---

[3] Because the issue on appeal is the status of the 118 drivers, we do not address the parties' arguments concerning the other twelve drivers.

(1) the agency was charged by the legislature with the duty of administering the statute; (2) the interpretation of the agency is one of long-standing; (3) the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) the agency's interpretation will provide uniformity in the application of the statute.

*Id.* at ¶ 16. We accord due weight deference "when an agency has some experience in an area, but has not yet developed the expertise that would place it in a better position than a court to make judgments regarding the interpretation of the statute." *Id.*, ¶ 17. We accord no deference "where the issue is one of first impression, where the agency has no special expertise, or where the agency's position has been so inconsistent that it provides no real guidance." *Id.*, ¶ 18. Additionally, if LIRC reasonably interprets the rules adopted by DWD's Unemployment Insurance Division, and its interpretation is not inconsistent with the language of the rules or clearly erroneous, we accord that decision controlling weight deference. *See id.*, ¶¶ 12–13. This level of deference is similar to great weight deference, both of which "turn on whether the agency's interpretation is reasonable and consistent with the meaning or purpose of the regulation or statute." *Id.*, ¶ 15 (citation omitted).

██

¶ 5. We uphold LIRC's findings of fact if they are supported by credible and substantial evidence. *See* WIS. STAT. § 102.23(6). Evidence is "credible and substantial" if it is "relevant, probative, and of a nature that it was not completely discredited as a matter of law by other uncontrovertible facts," and, "when most favorably viewed, . . . [would] justify persons of ordinary reason and fairness to reach a conclusion based upon

it." *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 53–54, 330 N.W.2d 169 (1983).

¶ 6. DWD argues that LIRC's interpretation of Wis. Stat. § 108.02 and Wis. Admin. Code § DWD 105 is not entitled to any deference because its interpretation is inconsistent with the plain meaning of the rules and undermines the purpose of the statute. DWD also argues that LIRC has only decided five cases under § DWD 105, and therefore has not developed the level of expertise necessary to support applying great weight or controlling deference in this case. LIRC responds that its interpretation of § 108.02 and § DWD 105 are of long standing, and asserts that DWD's claim that LIRC has decided only five cases under § DWD 105 is not accurate, pointing to the cases in its database of unemployment tax cases that implicate that administrative code section. It further argues that if we do not accord its decision great weight deference, we must accord it due weight deference, because it has at least some expertise and experience in interpreting the applicable statute and rules. As we explain more fully below, we conclude that LIRC's interpretation and application of the statute and rules in this case was not reasonable or consistent with the purpose of the provisions, and therefore does not withstand review even if we accord great weight or controlling deference to its decision.

## Discussion

¶ 7. DWD argues that LIRC erred in determining that Dunham's contract drivers are "contractors" rather than "employees" under Wis. Stat. § 108.02 and Wis. Admin. Code § DWD 105, and that therefore Dunham is not liable for unemployment insurance contributions

73

for those drivers.[4] DWD disputes LIRC's factual findings and its interpretation of the statute and rules, contending that the evidence established that the drivers were "employees," and thus LIRC was required to find that Dunham was liable for unemployment insurance contributions on their behalf. LIRC responds that its interpretation of § 108.02 and § DWD 105 is reasonable and its findings of fact are supported by substantial and credible evidence, and therefore may not be set aside. We conclude that LIRC's interpretation and application of the statute and rules to the facts in this case were not reasonable or consistent with the purpose underlying the unemployment compensation statutes and regulations. We therefore reverse LIRC's determination that Dunham's 118 "contract drivers" are not "employees" of Dunham.

¶ 8. WISCONSIN STAT. § 108.02(12)(a) defines "employee," for purposes of determining an employer's liability for unemployment insurance contributions, as "any individual who is or has been performing services for pay for an employing unit, whether or not the individual is paid directly by the employing unit, except as provided in par. (b), (bm), (c), (d), (dm) or (dn)." The parties agree the contract drivers in this case meet the

---

[4] We review the decision of LIRC, not the circuit court. *See DaimlerChrysler v. LIRC*, 2007 WI 15, ¶ 11, 299 Wis. 2d 1, 727 N.W.2d 311. However, we value the analysis of the circuit court even where we owe no deference to its decision. *See Zehetner v. Chrysler Fin. Co., LLC*, 2004 WI App 80, ¶ 11, 272 Wis. 2d 628, 679 N.W.2d 919. Thus, we do not agree with the circuit court's statement that "[e]xtended analysis by [the circuit] court is largely pointless, inasmuch as the court of appeals is essentially uninterested in [the circuit] court's opinion." Each reviewing court is required to make the same independent and careful review.

definition of "employee" under § 108.02(12)(a), and dispute only whether they fall within the exception under subsection (c). Under subsection (c),

> Paragraph (a) does not apply to an individual performing services for . . . any . . . employing unit in a capacity as a logger or trucker if the employing unit satisfies the department:

> 1. That such individual has been and will continue to be free from the employing unit's control or direction over the performance of his or her services both under his or her contract and in fact; and

> 2. That such services have been performed in an independently established trade, business or profession in which the individual is customarily engaged.

Thus, pertinent to this case, under § 108.02(12)(a) and (c), individuals who perform trucking services for pay are "employees" unless they perform those services free from the employing unit's direction and control, and also provide those services in the course of independently established businesses.

¶ 9. WISCONSIN ADMIN. CODE § DWD 105 provides guidance for determining whether an individual meets the two-part test for the exception to employee status under WIS. STAT. § 108.02(12)(c). First, § DWD 105.03 provides:

> (1) The department shall examine the factors enumerated in this section to determine, both under contract and in fact, whether the contract operator is free from a carrier's direction or control, while the contract operator performs services for the carrier. The department shall determine whether:

> (a) The contract operator owns the motor vehicle or holds the vehicle under a bona fide lease arrangement with any person other than the carrier;

(b) The contract operator is responsible for the maintenance of the motor vehicle;

(c) The contract operator bears the principal burden of the motor vehicle operating costs including such items as fuel, repairs, supplies, insurance and personal expenses while on the road;

(d) The contract operator supplies, or is responsible for supplying, the necessary personal services to operate the motor vehicle;

(e) The contract operator determines the details and means of performance, namely, the type of equipment, assignment of driver, loading, routes and number of stops to be made during the haul, as well as starting, completion and elapsed times;

(f) The contract operator may refuse to make a haul when requested by the carrier;

(g) The contract operator may terminate the lease at any time after reasonable notice; and

(h) The contract operator is compensated on a division of the gross revenue or by a fee based upon the distance of the haul, the weight of the goods, the number of deliveries, or any combination of these factors.

Under § DWD 105.03(2), if all of these factors are met, the contract operator is free from the carrier's direction and control; if any of the factors are not met, the department must consider whether:

(a) The contract operator may negotiate with the carrier to determine the method, frequency and regularity of payments made to the contract operator;

(b) The contract operator has the authority to discharge any driver whom he or she employs;

(c) The carrier requires decals, lettering, signs, emblems or other markings on the contract operator's motor vehicle for the purpose of advertising the carrier's name or business;

(d) The carrier requires the contract operator to submit reports;

(e) The carrier requires the contract operator to obey any work rules or policies; and

(f) The carrier requires any deductions from payments owing to the contract operator for federal or state income taxes or taxes under the federal insurance contributions act.

¶ 10. If the individual is under the carrier's direction or control according to the factors set forth in Wis. Admin. Code § DWD 105.03, the individual is an "employee" under Wis. Stat. § 108.02(12)(c). *See* § DWD 105.03(3). If, however, the individual is free from the carrier's direction and control, the next consideration is whether the individual is engaged in an independently established business in performing those services. Section DWD 105.04(1) provides the following factors for determining whether an individual is engaged in an independently established business:

(a) The contract operator owns the motor vehicle or holds the vehicle under a bona fide lease arrangement with any person other than the carrier;

(b) The contract operator is free to hire another person as a driver in the performance of services for the carrier; and

(c) The contract operator is free to reject hauling a load offered by the carrier.

Under § DWD 105.04(2), if each factor is met, the individual is performing services in an independently

established business; if any of the factors are not met, the department considers whether:

> (a) The contract operator's business may provide a means of livelihood that is separate and apart from the livelihood gained from services performed for a particular carrier;

> (b) The business would continue if the relationship with the carrier were terminated; and

> (c) The contract operator has an ownership interest in a business that the contract operator alone may sell or give away without restriction from the carrier.

Only if the individual is both free from the carrier's direction and control, and engaged in an independently established business, is the individual an independent contractor as opposed to an employee under § 108.02(12)(c)1. and 2. *See* § DWD 105.04(3). The rules do not dictate that each factor must be met to establish that individuals are independent contractors, nor do they dictate a minimum threshold that must be met to meet the test.

¶ 11. Here, LIRC determined that Dunham's 118 contract drivers were both free from Dunham's direction and control and engaged in independently established businesses. LIRC reviewed the record before the ALJ and made the following findings of fact supporting its decision: Dunham developed pickup and delivery routes based on "geographical compactness and customer deadlines." It then prepared a "bid sheet" for each route, which set forth an amount for the bidder's consideration. Dunham sometimes received competing bids. Bidders assessed the costs and profitability of each route, and actively negotiated with Dunham, which considered counterbids by drivers. After Dunham and a driver successfully negotiated the amount for a route,

the driver and Dunham entered into a contract for that route. Each driver owned his or her own vehicle, or leased the vehicle from an entity other than Dunham. Drivers were responsible for the costs of operating and maintaining their vehicles, insurance coverage, and other equipment, such as phones and electronic scanners. Dunham required the drivers' vehicles to be white and to display Dunham's name, logo, and Department of Transportation (DOT) number. The decal requirement was primarily motivated by WIS. STAT. § 194.09, which requires delivery vehicles to identify the carrier, but was also motivated by a desire to advertise Dunham. Drivers were permitted to display their own names or business names on their vehicles. Dunham also required that the drivers wear Dunham uniforms and lock their vehicles between deliveries. Drivers were not provided a copy of Dunham's employee handbook.

¶ 12. Drivers were able to hire their own employees to drive or assist with loading and unloading on routes they contracted to perform. The drivers' contracts with Dunham required the drivers' employees to meet Dunham's standards for drivers, particularly requirements under federal law. Drivers who had contracted to do particular routes were offered additional stops on an ad hoc basis, and were free to decline those additional stops. Drivers independently determined which roadways to use to complete the pickups and deliveries they had contracted to perform, as well as which vehicle to use, the manner of loading and unloading the vehicle, and the timing required to meet customer deadlines. Drivers were permitted to provide driving services for other companies, as long as those services did not occur simultaneously with the services provided for Dunham, and provided the services were not performed for a Dunham competitor serving a

Dunham customer. Either party could terminate the contract on thirty-days' notice, and Dunham could also terminate the contract if the driver substantially breached the contract. Drivers were generally paid biweekly, unless they requested a different payment frequency.

¶ 13. LIRC determined that, based on these facts, the drivers were independent contractors rather than employees under WIS. STAT. § 108.02(12)(c) and WIS. ADMIN. CODE § DWD 105. LIRC determined that Dunham had met its burden of establishing that the drivers were free from its direction and control under the factors set forth in § DWD 105.03(1). LIRC explained that the parties did not dispute that § DWD 105.03(1)(a), (b), (c), (d) and (g) were met, and LIRC agreed that the record established each of those factors were satisfied (because drivers (a) owned or leased their own vehicles; (b) maintained their vehicles; (c) paid the costs of operating their vehicles; (d) operated their own vehicles or hired employees to operate their vehicles; and (g) could terminate their contracts on reasonable notice to Dunham).

¶ 14. LIRC then determined that Dunham had also established that the factors in dispute had been met. First, LIRC said that under WIS. ADMIN. CODE § DWD 105.03(1)(e), the drivers "determine[d] the details and means of performance, namely, the type of equipment, assignment of driver, loading, routes and number of stops to be made during the haul, as well as starting, completion and elapsed times." LIRC said that the requirements in the contracts between Dunham and the drivers as to pickup and delivery deadlines and locations, as well as arrangements of stops on a route, were dictated by customer deadlines and demands rather than by Dunham, and therefore could not sup-

80

port DWD's argument that Dunham controlled the details of the drivers' services. *See* § DWD 105.02 ("In determining whether the carrier exercises direction or control and whether the contract operator is engaged in an independently established business, the department may not use as evidence any factor to the extent that it is specified by the shipper or required by state or federal laws or regulations."). LIRC interpreted "route" to refer to "the series of roadways a driver uses to travel from one pickup/delivery location to another," and interpreted "stops" to mean "down time between such locations for purposes of rest breaks or meals." Thus, LIRC rejected DWD's argument that Dunham controlled "routes and number of stops to be made during the haul," which relied on an interpretation of "routes" and "stops" as the groupings of pickups and deliveries that Dunham prepared for its bid sheets.

¶ 15. Next, LIRC rejected DWD's argument that drivers were not free to reject hauls under WIS. ADMIN. CODE § DWD 105.03(1)(f). It interpreted "haul" to mean the route organized by Dunham, and determined that because a contract driver was free to decline bidding on that "route," the driver was free to refuse that "haul." Further, LIRC determined that because drivers under contract could refuse additional ad hoc hauls without penalty, they were free to refuse hauls under § DWD 105.03(1)(f). It also rejected DWD's argument that § DWD 105.03(1)(h), concerning driver compensation, weighed in its favor. LIRC relied on the testimony of Dunham's CEO and contract drivers as to compensation calculations. Thus, LIRC determined that all of the factors under § DWD 105.03(1) were met to establish that the drivers were not under Dunham's direction or control in performing their services.

81

¶ 16. Although LIRC's determination that all the factors under Wis. Admin. Code § DWD 105.03(1) were met rendered an analysis of § DWD 105.03(2) unnecessary, LIRC also determined that all of the factors under subsection (2) were met. LIRC noted that it was undisputed that § DWD 105.03(2)(b), (d), and (f) were met in favor of Dunham (because the drivers (b) could discharge their own employed drivers; (d) only submitted reports to comply with DOT requirements; and (f) were not subject to tax withholdings by Dunham). LIRC determined that under § DWD 105.03(2)(a), the drivers were free to negotiate over the method, frequency, and regularity of payments, based on the testimony of Dunham's CEO. It also determined that under § DWD 105.03(2)(c), Dunham's decal requirements were primarily intended to comply with identification requirements under Wis. Stat. § 194.09 and security concerns, and only secondarily intended for advertising purposes. It determined that the uniform requirement was irrelevant under this subsection as it did not concern the vehicle. Finally, LIRC determined that under § DWD 105.03(2)(e), Dunham did not require drivers to obey work rules or policies, because the requirements that drivers wear uniforms, drive a white vehicle with the Dunham decal, and lock their vehicles between stops were all imposed to address security concerns and followed from requirements of specific customers. Additionally, LIRC was persuaded by the fact that the drivers were not provided Dunham employee handbooks.

¶ 17. LIRC then addressed whether the drivers were engaged in independently established businesses in performing services for Dunham, under Wis. Admin. Code § DWD 105.04. LIRC explained that it was undisputed that § DWD 105.04(1)(a) and (b) were met (be-

cause the drivers (a) owned or leased their vehicles from third parties; and (b) were free to hire their own employees to perform deliveries under their contracts). LIRC also determined that under § DWD 105.04(1)(c), drivers were free to reject hauling loads offered by Dunham, based on its determination that drivers were free to reject hauls under § DWD 105.03(1)(f), above. LIRC declined to consider the factors under § DWD 105.04(2), since it determined all the factors under subsection (1) were satisfied. It therefore determined the drivers were independent contractors rather than employees under Wis. Stat. § 108.02(12)(c).

¶ 18. We conclude that, even according great weight or controlling deference to LIRC's determination that all of the factors under Wis. Admin. Code § DWD 105.03(1) were met on the facts of this case, that determination does not withstand review. When we accord an agency's interpretation of a statute or rule great weight or controlling deference, our focus is "whether the agency's interpretation is reasonable and consistent with the meaning or purpose of the regulation or statute." *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 19. We agree with DWD that LIRC's interpretation and application of § DWD 105.03(1) to the facts of this case was neither reasonable nor consistent with the purpose of Wis. Stat. § 108.02.

¶ 19. In cases arising under the Unemployment Insurance Act, we begin with the premise that "the act itself should be put in perspective, and the underlying purpose of the act should be given paramount consideration." *See Princess House*, 111 Wis. 2d at 61. The legislature has set forth the public policy underlying the Unemployment Insurance Act in Wis. Stat. § 108.01,

stating that "[u]nemployment in Wisconsin is recognized as an urgent public problem, gravely affecting the health, morals and welfare of the people of this state," and that "[e]ach employing unit in Wisconsin should pay at least a part of this social cost, connected with its own irregular operations, by financing benefits for its own unemployed workers." Section 108.01(1). In subsection (2), the statute provides that "[a] sound system of unemployment reserves, contributions and benefits should induce and reward steady operations by each employer, since the employer is in a better position than any other agency to share in and to reduce the social costs of its own irregular employment." The supreme court has explained that the legislature enacted the Unemployment Insurance Act

> to relieve "unemployed workers" and "wage earners." The subsection shows that the act contemplates compensation for loss of earnings by workers. This must be given great-even controlling-effect, in determining who are employees under the act as it is the employees who are to receive the compensation provided for.

*Princess House*, 111 Wis. 2d at 62 (citation omitted). Thus, the court concluded, "the statute is remedial in nature and should be liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status." *Id.*

¶ 20. With this underlying statutory purpose in mind, we conclude that LIRC's determination that the drivers were free from Dunham's direction and control under Wis. Admin. Code § DWD 105.03 was unreasonable. LIRC explained that the drivers determined the details and means of their performance under § DWD 105.03(1)(e), because it interpreted "routes and number

of stops" to mean the series of roadways a driver would follow and rest times between pickups and deliveries, which drivers determined. LIRC said only that it found these interpretations more reasonable, "taking into account the practices of the trucking industry as a whole." On appeal, LIRC does not argue that its interpretation derives from practices in the trucking industry. Rather, LIRC contends that even though Dunham's bid sheets define "route" as "the customer service group, not . . . specific highway or street routes of travel, which are determined by Contractor at Contractor's sole discretion," and the bid sheets appear to refer to "stops" as points of pickup or delivery, its master lease agreement refers to "rest stops" and "street and highway routes," thus supporting LIRC's interpretation. We disagree. If the rule meant "rest stops" or "street and highway routes," it would have used those words. Because Dunham arranged routes and stops in preparing its bid sheets, the only reasonable finding is that the drivers did not determine the routes and number of stops to be made during the haul.[5]

¶ 21. Moreover, it was unreasonable for LIRC to rely on only one component of WIS. ADMIN. CODE § DWD 105.03(1)(e) to determine Dunham had met its burden

_____

[5] LIRC argues that, even employing these definitions, the drivers determined the routes and number of stops to be made during the haul. The only evidence LIRC points to is that drivers could obtain Dunham's approval to change the routes and stops that Dunham had arranged. This is hardly evidence that the drivers determined the details of their performance by determining the routes and numbers of stops. Moreover, although LIRC contends that Dunham's bid sheets are not contractual requirements, but merely part of the negotiations between potential contract drivers and Dunham, it is undisputed that Dunham prepared those bid sheets and deviation was the exception rather than the rule.

to establish this factor was met. *See* § DWD 105.03(1)(e) (requiring a focus on whether the driver "determines the details and means of performance, namely, the type of equipment, assignment of driver, loading, routes and number of stops to be made during the haul as well as starting, completion, and elapsed times"). Turning to the other criteria that LIRC failed to address, it is clear that, overall, the drivers did not determine the details of their performance.

¶ 22. First, no reasonable view of the evidence would support a finding that the drivers determined the "type of equipment" to use. It is undisputed that Dunham requires its drivers to use white vehicles bearing the Dunham logo. On appeal, LIRC argues that "type of equipment" does not encompass vehicle color and logo requirements. We conclude, however, that a plain reading of "type of equipment" encompasses color and logo requirements, and LIRC has not persuasively explained why we should exclude those requirements from consideration.[6]

¶ 23. Next, LIRC argues that the requirement for white vehicles bearing the Dunham logo was based on legal and customer requirements, and therefore must be disregarded under WIS. ADMIN. CODE § DWD 105.02. The problem with this argument, however, is that LIRC has not identified any legal or customer requirement that their drivers' vehicles must be white and bear the Dunham logo. That is, while LIRC points to legal requirements that vehicles bear Dunham's identifying information and some customer requirements for identifiable vehicles, it does not point to any specific re-

---

[6] We also reject LIRC's argument that any criteria as to vehicles may not be considered because other provisions go to vehicle requirements; we find this reasoning incomplete and unsound.

quirements for *white* vehicles bearing its *logo,* based in law or customer requests.[7] The only reasonable view of the evidence, therefore, is that Dunham determined the type of equipment drivers were required to use.[8]

¶ 24. Additionally, the evidence makes clear that Dunham placed at least some restrictions on the drivers' assignments of other drivers to provide delivery services under their contracts. While the parties dispute the extent to which the drivers or Dunham controlled termination of those drivers' services, any control Dunham retained over approving or terminating sub-drivers weighs against a finding that the drivers

[7] DWD contends that only one Dunham customer testified that it required clearly marked vehicles, and that customer's contract contradicted its testimony. Thus, DWD argues, Dunham established only that it was desirable for Dunham drivers to use white trucks bearing the Dunham logo for customer satisfaction and security purposes, not that customers specified use of white trucks with the Dunham logo. LIRC contends that even though the contract of its customer who testified as to the requirement of marked vehicles did not contain the requirement, Dunham's CEO testified that he understood the color and logo requirements to serve security purposes for Dunham's customers. Even accepting LIRC's argument, this does not lead to the conclusion that the standard requirement for white vehicles bearing the Dunham logo was based on customer rather than employer requirements. There is a difference between an identification and a logo.

[8] DWD also argues that because the bid sheets stated what size of vehicle a driver was required to use, Dunham controlled the type of equipment. LIRC responds that the vehicle size requirement was dictated by the size of items for pickup or delivery, not Dunham. Even accepting LIRC's argument, we conclude that Dunham's color and logo requirements established that Dunham controlled the type of equipment drivers were to use.

determined the details of their performance.[9] Weighing the criteria listed under WIS. ADMIN. CODE § DWD 105.03(1)(e), and liberally construing the provision in favor of employee status, we conclude that no reasonable view of the evidence supports finding that this element was met in favor of independent contractor status.[10]

¶ 25. Because at least one element under WIS. ADMIN. CODE § DWD 105.03(1) is lacking, we turn to § DWD 105.03(2). DWD argues that LIRC erred in finding that under subsection (c) and (e), Dunham did not "require[] decals, lettering, signs, emblems or other markings on the contract operator's motor vehicle for the purpose of advertising the carrier's name or business" or "require[] the contract operator to obey any work rules or policies." We agree. First, LIRC found that

[9] DWD contends that the evidence established that Dunham could terminate drivers for cause, and that Dunham's CEO equivocated over whether such drivers would then be allowed to drive as substitute drivers for other contract drivers. LIRC argues that there is substantial and credible evidence in the record to support its finding that drivers determined the assignment of drivers under their contracts. It contends that the restrictions it placed on its drivers' selection of substitute drivers largely followed from legal requirements and customer demands, with the only exception being that Dunham restricted the use of drivers who had been terminated for egregious conduct. We need not resolve this dispute; it is sufficient for purposes of our discussion that it is undisputed that Dunham placed at least some restrictions on its drivers' selection of substitute drivers based on its own policies rather than customer or legal requirements.

[10] Because we conclude that WIS. ADMIN. CODE § DWD 105.03(1)(e) was not met, thus requiring an analysis of the factors under subsection (2), we need not resolve the parties' dispute over whether § DWD 105.03(1)(f) was also lacking.

88

Dunham required driver vehicles to bear the Dunham logo primarily for security and customer satisfaction purposes, but also for advertising purposes. The plain language of § DWD 105.03(2)(c) focuses only on whether the logo was required "for the purpose[s] of advertising," not whether advertising was the primary purpose. We have no basis to reverse LIRC's factual finding that Dunham required drivers to bear its logo at least in part for advertising purposes, and therefore this factor weighs in favor of finding that the drivers were under Dunham's direction and control.

¶ 26. Next, it is undisputed that Dunham required the drivers to wear Dunham uniforms, drive white vehicles with Dunham decals, and lock their vehicles between stops. LIRC determined that these requirements were necessary for security concerns and some customer requests. However, the plain language of Wis. Admin. Code § DWD 105.03(2)(e) requires a focus on whether Dunham required drivers "to obey any work rules or policies," not whether the employer had a valid reason for those requirements. Moreover, as discussed above, Dunham did not establish that customer or legal specifications were the basis of these requirements, which would bring them out of the scope of our review under § DWD 105.02. We therefore conclude that, based on this evidence, the only reasonable finding is that Dunham required the drivers to follow at least some work rules and policies, as contemplated under § DWD 105.03(2)(e).

¶ 27. We recognize, as LIRC contends, that Wis. Admin. Code § DWD 105.03 does not require that a certain minimum number of factors support a finding that individuals are free from an employer's direction and control, and that DWD concedes that most of the factors weigh in favor of LIRC's decision. However, we

89

conclude that the factors that weigh in favor of a finding that the drivers were not free from Dunham's direction and control, as explained above, are significant enough that, in light of the Unemployment Insurance Act's stated purpose, LIRC's determination that the drivers were free from Dunham's direction and control was unreasonable and contrary to the act's purpose. Thus, by the plain terms of § DWD 105.03(3), the drivers are Dunham's employees under WIS. STAT. § 108.02(12)(c).[11] Accordingly, we reverse.

*By the Court.*—Order reversed.

■■■■

[11] We therefore need not review LIRC's determination that drivers performed services for Dunham in the course of independently established businesses under WIS. ADMIN. CODE § DWD 105.04.